# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-16-0181-TUC-JGZ (JR) |
| Plaintiff, | **REPORT & RECOMMENDATION** |
| v. | |
| Jacob Richard Mendez, | |
| Defendant. | |

Pending before the Court are Defendant Jacob Richard Mendez's Motion to Suppress Evidence (Doc. 39) and Motion to Suppress Statements (Doc. 46).[1] The Government filed a Response (Doc. 54) and the Defendant replied (Doc. 55). Defendant is charged with one count of Conspiracy to Possess with Intent to Distribute Cocaine and Methamphetamine, in violation of 21 U.S.C. § 846, one count of Possession with Intent to Distribute Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), one count of Possession with Intent to Distribute Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), one count of Conspiracy to Import Cocaine and Methamphetamine in violation of 21 U.S.C. § 963, one count of Importation of Cocaine in violation of 21 U.S.C. § 952(a) and §§ 960(a)(1) and 960(b)(3), and one count of Importation of Methamphetamine in violation of 21 U.S.C. § 952(a) and §§ 960(a)(1) and

---

[1] The plea deadline is December 30, 2016, and the trial is set for January 18, 2017. (Doc. 50).

960(b)(3). (Doc. 11 (Indictment)). In his Motion to Suppress Evidence, Defendant seeks the suppression of all information and data obtained from a cellphone and a camera seized from the vehicle he was driving at the time of his arrest. In his Motion to Suppress Statements, Defendant seeks to suppress all statements related to the ownership of the cellphone.

Pursuant to LRCrim. 5.1(a), this matter was referred to Magistrate Judge Rateau for an evidentiary hearing and a report and recommendation. On November 7, 2016, the Court conducted an evidentiary hearing. (Doc. 59 (transcript)).[2] The Government called one witness, Christopher Woods, a Special Agent with United States Immigration and Customs Enforcement Homeland Security Investigations. The Defendant did not testify or call any witnesses. Based on the pleadings, testimony, and arguments of counsel, the Court recommends that the District Court, after its independent review, deny Defendant's Motion to Suppress Evidence and grant Defendant's Motion to Suppress Statements.

**I.     Hearing Testimony**

At approximately 11:00 a.m. on December 31, 2015, Agent Woods, who was 10 or 15 minutes north of the border, was called to the DeConcini Port of Entry ("POE") in Nogales, Arizona, where Customs and Border Patrol ("CBP") officers had discovered 20.22 kilograms of cocaine and 1.12 kilograms of methamphetamine in a 2008 Mitsubishi Endeavor. TR6-7, 19-20.

Upon arrival at the POE, Agent Woods first identified and informally interviewed the CBP officers involved and surveyed the vehicle. TR7-8, 20. He was told that there were two occupants in the vehicle, one of them, the driver, was Defendant. TR8. During the course of interviewing the officers and inspecting the vehicle, one of the CBP officers gave Agent Woods two phones, an Azumi brand phone and a Samsung Galaxy phone, and a camera, that were found in the Mitsubishi. TR9-10, 19, 28, 48, 45, 52. Based on his experience, Agent Woods is aware that drug trafficking organizations often

---

[2] The transcript is cited herein as "TR" followed by the page number where the cited testimony appears.

1 communicate using cellular phones, making the phones especially valuable to
2 investigations because they may contain sensitive information. TR16-18, 36.

3       Agent Woods asked the Defendant, who had been formally arrested and was being
4 detained in a holding cell at the POE, if he was willing to be interviewed and the
5 Defendant invoked his right to counsel. TR21, 28. Agent Woods does not recall if it was
6 before or after the Defendant invoked, but he asked him if the Azumi phone belonged to
7 him and the Defendant confirmed that it did. TR10, 21-22, 31-32, 35, 50-51. Agent
8 Woods then "went through [the phone] by hand, examining the text messages and any
9 potential photographs that were in . . . the phone." TR10, 21-22. Agent Woods was
10 looking for "[a]ny implicating messages or evidence of the crime at hand and also of
11 anything that might allude to or evidence of a separate criminal nature," and the
12 examination took no more than several minutes. TR11-12. At that time the phone was
13 not subjected to any forensic analysis, such as the use of a Cellebrite device. TR10-11.
14 Agent Woods also examined the camera by "clicking through the images" and found two
15 photographs of what appeared to be marijuana bales. TR46-47. Later that afternoon
16 while at his office, Agent Woods took photographs of text messages that he found on the
17 phone and the photos from the camera. TR34, 51, 54.

18       Agent Woods also examined the Samsung Galaxy and found nothing relevant to
19 the crime at hand or any other crimes. The agent subsequently returned the Samsung
20 Galaxy to the passenger, Carolina Enriquez-Amaro, when she was released from the
21 Santa Cruz County Jail on January 4, 2016, after the United States Attorney declined
22 prosecution. TR12-13.

23 **II.  Discussion**

24     **A.  Motion to Suppress Evidence**

25 All searches must be reasonable under the Fourth Amendment, which provides:

26
27     The right of the people to be secure in their persons, houses, papers, and
    effects, against unreasonable searches and seizures, shall not be violated,
28     and no Warrants shall issue, but upon probable cause, supported by Oath or
    affirmation, and particularly describing the place to be searched, and the

- 3 -

persons or things to be seized.

U.S. Const. amend. IV.  Although the Fourth Amendment does not specify, and Supreme Court has not exhaustively described, the circumstances that support a search without a warrant, it is well-settled that border searches are exempt from the warrant requirement. *See Untied States v. Montoya de Hernandez*, 473 U.S. 531 (1985).  Under the border search exception, law enforcement may conduct "routine" searches of property at the border without first obtaining a warrant or establishing any level of individualized suspicion. *Id*. at 538.  As the Government has reminded the Court in this and other cases, the Fourth Amendment and the Supreme Court allow such searches because "[t]he Government's interest in preventing the entry of unwanted person and effects is at its zenith at the international border." *United States v. Flores-Mantano*, 541 U.S. 149, 152 (2004).  Due to this heightened governmental interest, it is well-established that searches made at the border "are reasonable simply by virtue of the fact that they occur at the border." *United States v. Ramsey*, 431 U.S. 606, 616 (1977).

The border search exception is not, however, without limit.  Addressing the Fourth Amendment's "reasonableness" requirement in relation to border searches, the Supreme Court has distinguished between "routine" and "nonroutine" searches, holding that only "[r]outine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." *Montoya de Hernandez*, 473 U.S. at 538 (citing *Ramsey*, 431 U.S. at 618-19).  What the contours are dividing the routine from the nonroutine has not been explicitly addressed by the Supreme Court.  It is clear that "the Government's authority to conduct suspicionless inspections at the border includes the authority to remove, disassemble, and reassemble a vehicle's fuel tank." *Flores-Mantano*, 541 U.S. at 155.  But, in *Montoya de Hernandez*, the Supreme Court determined that a nonroutine seizure occurred when the defendant was detained for sixteen hours while border agents obtained a court order to conduct a rectal examination, but nevertheless found the seizure constitutional because it was supported by the agents' reasonable suspicion that the defendant was smuggling drugs in

1  her alimentary canal.  473 U.S. at 541.

2  Despite the fact that neither the Supreme Court nor any lower court has ever
3  required anything beyond reasonable suspicion to justify any border search, *see, e.g.,*
4  *United States v. Cotterman*, 709 F.3d 952, 962-63 (9th Cir. 2013) (requiring reasonable
5  suspicion for extensive forensic examination of electronic devices seized at the border);
6  *United States v. Saboonchi*, 48 F.Supp.3d 815, 819 (D. Md. 2014) (where the court noted
7  that "Defendant has not cited to a single case holding that anything more than reasonable
8  suspicion was required to perform a search of even the most invasive kind at the
9  international border, and I have found none."), Defendant contends that recent Ninth
10 Circuit decisions recognize the heightened privacy interests associated with cellphones,
11 and should be interpreted to require that agents obtain a warrant prior to manually
12 searching a such a device.  Such an extreme result is not supported by an examination of
13 relevant Ninth Circuit authority.

14 In *United States v. Arnold*, 533 F.3d 1003 (9th Cir. 2008), the defendant was
15 returning from a trip to the Philippines and was stopped at the airport by customs officials
16 and asked to turn on his laptop computer.  *Id*. at 1005.  After an initial examination of
17 two desktop folders revealed a photo of nude women, the laptop was searched for several
18 hours by agents who discovered images they believed to depict child pornography.  *Id*.
19 The defendant sought to suppress the photos, arguing that reasonable suspicion was
20 required to support the search.  *Id*.  The Ninth Circuit disagreed, observing that a laptop
21 was not entitled to a heightened expectation of privacy because "beyond the simple fact
22 that one cannot live in a laptop, . . a laptop goes with the person, and therefore is 'readily
23 mobile.'"  *Id*. at 1009-10 (citing *California v. Carney*, 471 U.S. 386 (1985)).  The court
24 also analogized the laptop search to the gas tank search that was found constitutional in
25 *Flores-Montano*, finding that "a search which occurs in an otherwise ordinary manner,"
26 is not "'particularly offensive' simply due to the storage capacity of the object being
27 searched."  *Id*. at 1010 (citation omitted).

28 Several years later, in *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013),

the Ninth Circuit refined its approach to the border search of digital devices and found that, under certain circumstances, reasonable suspicion was necessary before a search could be conducted. *Cotterman* did not involve the sort of "unintrusive search" that was performed by the agents in *Arnold*. Rather, the search of Cotterman's laptop involved the use of computer forensic software and the "painstaking analysis" of the hard drive, including deleted data. *Id*. at 962-63. While the court continued to approve of the search undertaken in *Arnold*, it found that the extensive forensic examination of the Cotterman's laptop required reasonable suspicion in light of the significant expectation of privacy in such digital devices. *Id*. at 966. Thus, after *Cotterman*, border searches of digital devices are subject to two standards. Under *Arnold*, manual searches require no suspicion at all, and under *Cotterman*, intrusive forensic examinations require reasonable suspicion. *See United States v. Ramos*, -- F.Supp.3d –, 2016 WL 3552140 at *4 (S.D. Cal. 2016).

Defendant argues that the Supreme Court case of *Riley v. California*, 134 S.Ct. 2473 (2014), modified the requirements outlined in *Arnold* and *Cotterman*. Specifically, he argues that due to the immense storage capacity of cellphones, and the heightened privacy interests in the data stored on cellphones, "place such devices in a *sui generis* category for which a warrant should be required prior to police access, regardless of whether the search occurred at the border or not." *Motion to Suppress Evidence*, p. 6. The Court finds that while *Riley* may have modified the standards announced in *Arnold* for conducting a manual search of a cellphone at the border, it cannot fairly be interpreted as requiring a warrant for such a search.

The question addressed in *Riley* was whether law enforcement officers are permitted to search digital information on a cellphone as part of a warrantless search incident to an arrest. 134 S.Ct. at 2480. The decision does not address the border search exception at all, but it does make clear that the unique characteristics of cellphones put them in a category separate from other personal property. *Id*. at 2484-85, 2489-91. The Supreme Court concluded that, in light of the "immense storage capacity" of cellphones and the type of information stored on them, "a cell phone would typically expose to the

1  government far more than the most exhaustive search of a house." *Id*. at 2489-91. Those
2  characteristics, the Court concluded that, as a general rule, law enforcement officers must
3  obtain a warrant before searching the digital information on an arrestee's cellphone. *Id*.
4  at 2495.

5  In reaching its conclusion in *Riley*, the Supreme Court evaluated the
6  reasonableness of such searches by balancing "the degree to which [the search] intrudes
7  upon an individual's privacy" against "the degree to which it is needed for the promotion
8  of legitimate governmental interests." *Id*. at 2484-85. Applying this test, the Supreme
9  Court identified officer security and the preservation of evidence as the "legitimate
10 government interests" supporting a search incident to arrest. However, they found these
11 interests blunted because the digital information on a cellphone could not be used to harm
12 an officer and because, once the cellphone is in the custody of law enforcement, the
13 arrestee is unable to erase the evidence contained on the phone. *Id*. at 2486-87.

14 Turning to the privacy interests involved, the Supreme Court elevated the
15 cellphone above other personal property based on the volume and sensitivity of the
16 information usually stored on the device. *Id*. at 2489. The Court specifically noted that
17 the phones' immense storage capacity, including the usual collection of photos,
18 messages, internet browsing history, and contacts, reveal information about every aspect
19 of our lives, including faith, hobbies, health, and finances. *Id*. Weighing these privacy
20 interests against the government interest in officer safety and preventing the destruction
21 of evidence, the Supreme Court concluded that officers must generally obtain a warrant
22 before conducting a search of a cellphone incident to arrest. *Id*. at 2495.

23 The Ninth Circuit has yet to address *Riley's* impact on the border search exception.
24 However, the balancing test employed by the Supreme Court in *Riley* provides a useful
25 analytical framework for examining the level of suspicion needed to support the manual
26 search of a cellphone at the border. As set out above, the Supreme Court made clear in
27 *Riley* that the privacy interests in the information contained on cellphones is much greater
28 than the privacy interests in luggage and other personal effects. The Supreme Court went

so far as to conclude that a search of a cellphone could be more intrusive than the search of a person's home:

> Indeed, a cell phone search would typically expose to the government far more than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form – unless the phone is [found in the home].

*Id*. at 2491.  Thus, by finding the search of a cellphone in many respects more intrusive than the search of a home, the Supreme Court bestowed upon cellphones the highest level of Fourth Amendment protection traditionally reserved for the home.

The significant privacy interests in the contents of a cellphone must then be weighed against the governmental interests supporting the search.  Unlike a search incident to arrest, the purpose of a border search is not to prevent the destruction of evidence.  Rather, the Government is interested in "preventing the entry of unwanted person and effects," and this interest is "at its zenith at the international border."  *Flores-Mantano*, 541 U.S. at 152.  The Supreme Court has recognized that border searches were recognized "by the same Congress which proposed for adoption the original amendments to the Constitution . . . ."  *Ramsey*, 431 U.S. at 617.  In fact, the Supreme Court has noted "that border searches were not subject to the warrant provisions of the Fourth Amendment and were 'reasonable' within the meaning of [the Fourth] Amendment, has been faithfully adhered to by this Court."  *Id*.  In fact, "[t]here has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause."  *Id*. at 619.  Thus, applying the probable cause and warrant requirement in *Riley* to manual searches of cellphones at the border would significantly restrict these longstanding government interests.

Having rejected the idea that *Riley* requires a warrant under the circumstances of this case does not entirely resolve it application.  Certainly, there is a good argument that the heightened level of privacy in cellphones described by the Supreme Court could be interpreted as requiring the same reasonable suspicion for manual non-intrusive searches of cellphones that is required for detailed forensic examination of such devices.  *See*

- 8 -

*Cotterman*, 709 F.3d at 968.  However, even if the Ninth Circuit adopted this approach, reasonable suspicion for the manual search of Defendant's cellphone is easily found under the facts of this case.  "[R]easonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc).  It cannot be disputed that such suspicion came into existence when the agents discovered a large amount of cocaine and methamphetamine in Defendant's car and he was arrested.  As Agent Woods testified, drug trafficking organizations often communicate using cellular phones, making the phones especially valuable to investigations because they may contain sensitive information.  TR16-18, 36.  As such, even if *Riley* is interpreted as requiring reasonable suspicion, the facts of the case coupled with Agent Woods's knowledge established the suspicion needed to support the search of the cellphone.  *See Ramos*, -- F.Supp.3d --, 2016 WL 3552140 (reaching same conclusion under similar facts); *see also United States v. Martinez*, 2014 WL 3671271 (S.D. Cal. July 22, 2014) (upholding agents' warrantless border search of cellphone using Cellebrite technology as it was supported by reasonable suspicion).

### B.  Motion to Suppress Statements

In his Motion to Suppress Statements, Defendant contends that his statement admitting ownership of the Azumi phone should be suppressed.  The government has the burden of establishing, by a preponderance of the evidence, that a defendant waived his protection against self-incrimination under *Miranda* before an incriminating statement may be admitted in evidence. *See Colorado v. Connelly*, 479 U.S. 157, 158 (1986). The government has the burden of establishing compliance with *Miranda*, or if *Miranda* warnings were not given, that an exception applies.  *See United States v. Younger*, 398 F.3d 1179, 1185 (9th Cir.2005).

In this case, the Government does not dispute that Defendant was under arrest and in custody when Agent Woods questioned him about ownership of the phone.

Additionally, Agent Woods does not recall if he provided Defendant with his *Miranda* warnings before or after he asked him about the cellphone.  The Government argues that these factors are of no moment because Agent Woods's questions about the cellphone did not constitute an "interrogation" for *Mianda* purposes.  The Supreme Court has defined an "interrogation" as express questioning or its functional equivalent consisting of words or actions on the part of the police "that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 303 (1980).  The Government contends that the questions by Agent Woods were not reasonably likely to lead to an incriminating response, but were merely standard booking questions intended to accomplish "a proper inventory for chain of custody purposes." TR38.  That argument, however, is undermined by other testimony from Agent Woods. Upon questioning by defense counsel, Agent Woods admitted that he was aware that drug trafficking organizations often communicate using cellular phones and that the phones are especially valuable to investigations because they may contain sensitive information. TR16-18, 36.  Thus, he should have known that the question about ownership of the phone was likely to elicit an incriminating response by connecting Defendant to the phone and to any evidence stored on the phone.  Moreover, Agent Woods recognized that the Defendant could have denied ownership or refused to answer whether the Azumi phone belonged to him, and that the answer would amount to an admission that could later be used against him.  TR36-38.

This case can be analogized to the Ninth Circuit's decision in *United States v. Disla*, 805 F.2d 1340 (9th Cir. 1986).  In *Disla*, a search warrant was executed on an apartment and police discovered money and cocaine, along with several photographs of Disla.  805 F.2d 1340, 1342-43. One of the officers on the scene, Officer Zamora, spoke with several neighbors and obtained descriptions of the individuals residing at the apartment.  *Id*. at 1343.  Disla and his brother then drove up to the apartment and Disla was arrested, searched, handcuffed and taken inside the apartment.  *Id*.  Before advising Disla of his *Miranda* rights, Officer Zamora asked Disla for his name, age, address and

employment status. *Id*. at 1343. Disla told Officer Zamora that he resided at the apartment. *Id*. at 1344. Disla sought to have that statement suppressed, but his motion was denied by the district court and Disla was found guilty of possession of cocaine. *Id*. at 1344-45.

On appeal, although ultimately finding the admission of the statement harmless, the Ninth Circuit concluded that the question from Officer Zamora about Disla's residence constituted an interrogation, explaining that "officer Zamora should have known that the question regarding Disla's residence was reasonably likely to elicit an incriminating response" because "Zamora knew that a large quantity of cocaine and cash had been found at the . . . apartment and that the resident(s) of the apartment had not been identified." *Id*. at 1347. Like the question asked by Officer Zamora, the question asked by Agent Woods was seemingly routine. However, both the question asked of Disla and the question asked of Defendant in this case, linked a suspect to potentially incriminating evidence. In *Disla* it was the cocaine in the apartment and here it was the information on the cellphone. Accordingly, the question constituted custodial interrogation that occurred either without first providing *Miranda* warnings or, alternatively, after Defendant had invoked his right to remain silent. As such, the statement of ownership must be suppressed.

### III. Recommendation

Based on the foregoing, the Magistrate Judge recommends that the District Court, after an independent review of the record, DENY Defendant's Motion to Suppress Evidence (Doc. 39) and GRANT Defendant's Motion to Suppress Statements (Doc. 46).

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment. However, the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. See 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of

1 Civil Procedure. Thereafter, the parties have fourteen (14) days within which to file a
2 response to the objections. No replies are permitted without leave of court. If any
3 objections are filed, this action should be designated case number: **CR 16-0181-TUC-**
4 **JGZ**. Failure to timely file objections to any factual or legal determination of the
5 Magistrate Judge may be considered a waiver of a party's right to de novo consideration
6 of the issues. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en
7 banc).

Dated this 29th day of November, 2016.

Honorable Jacqueline M. Rateau
United States Magistrate Judge